# IN THE COURT OF APPEALS OF IOWA

No. 17-1662
Filed December 5, 2018

**STATE OF IOWA,**
     Plaintiff-Appellee,

**vs.**

**BRANDON BROWN,**
     Defendant-Appellant.

_____

Appeal from the Iowa District Court for Polk County, Jeffrey D. Farrell, Judge.

Brandon Brown appeals his conviction for stalking while in possession of a dangerous weapon. **AFFIRMED.**

Charles Isaacson of Charles Isaacson Law, PC, Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Sheryl Soich, Assistant Attorney General, for appellee.

Considered by Vogel, P.J., and Vaitheswaran and McDonald, JJ.

**VOGEL, Presiding Judge.**

Brandon Brown appeals his conviction for stalking while in possession of a dangerous weapon. He argues the evidence is insufficient to support his conviction. We find the evidence sufficient and affirm.

In October 2016, Ebony Quarles and her children came to the attention of the Iowa Department of Human Services (DHS). Brown is the father of one of her children, I.B., but he did not live with Quarles or I.B. DHS offered services to the family and left the children in Quarles's home.

Around 10:30 a.m. on March 3, 2017, Hayley Porter, a social worker at DHS, visited Quarles and the children in the home. After observing concerns, Porter began the process for voluntarily removing the children. She called Brown to ask if he could take the children, and he agreed. But Porter told Brown she needed to gather more information and she would call him back on whether he could take the children. The Polk County Attorney then denied permission for Brown to take the children due to matters related to an open case involving another child of his. About thirty minutes after the phone call, Brown arrived at the home and took three of the children—but not I.B., who was apparently in school at the time—with Quarles's permission. Porter and another DHS worker tried to stop him, but he refused to wait for a removal order and drove away with the three children who were unrelated to him.

Later that day, Porter obtained an emergency removal order for Quarles's children. I.B.'s school was placed on lockdown to prevent Brown from taking the child. Police stopped Brown outside the school, and Porter drove to the school

hoping to find where he took the children.[1]  During the encounter, Porter testified Brown said she is "going to pay," took pictures of her license plate while laughing, and repeatedly approached her close enough that officers told him several times to back up.  Brown testified he took pictures of all vehicles at the scene "for my own personal use so I can know what's going on.  Any time I interact with a police officer or anything, I make sure I take police pictures and videos of everything just to protect myself."  He acknowledged being angry outside the school, but he testified he was "calm" and "firm," and he denied the officers ever told him to back away from Porter.

After the encounter outside the school, all drove away but Porter noticed Brown was following right behind her and making every turn she made.  Fearful of Brown's tailing her, Porter drove toward the Des Moines police station, and she testified he stopped following her just before she got to the station.  Brown acknowledged following her when leaving the school, but he testified he only followed her because they left at the same time and they both travelled the same route back to the main road.

Porter testified Brown apparently called her personal cell phone later that day.  She did not know how he obtained her number, though she may not have blocked her number when she called him earlier.  She testified he said, "I'm going to make your life miserable," and demanded to know where I.B. was.  When she

---

[1] Brown did not have the three children with him outside the school.  When she asked about the children, Porter testified Brown "told us one story, that he met Ebony's mom halfway to Minnesota.  Then, another time, he told me that they were up the street and asked me to follow him, which the officers intervened and said absolutely not."  Brown testified he gave the children to their uncle, who then gave the children to their grandmother in Minnesota.  Brown and Quarles eventually returned the children during a visit with I.B.

refused to share information about I.B., Brown hung up. Porter also received multiple text messages, apparently from Brown, that indicated he knew personal information about her and her family. Brown denied calling her that evening or sending those text messages.

On or about March 10, police executed a search warrant at Brown's home looking for the three children. Police called Porter to the home to identify the children. She testified Brown yelled and charged at her when he saw her inside his home, causing the officers to hold him back. He denied charging at her or being restrained. Porter determined the children in the home were not Quarles's children, but she testified Brown kept trying to confront her as she left. An officer followed her home at her request.

Because of Brown's actions, DHS removed Porter from I.B.'s case. However, Brown continued to call Porter's personal and office phones even after being told she was no longer working on I.B.'s case. He testified he called her and visited the DHS office because he wanted information about I.B. and he was frustrated that no one would provide the information he requested.

On April 13, the court held the removal hearing for Quarles's children at the Polk County Justice Center. Attendees at the hearing included Brown, Quarles, and Porter. Porter testified Brown was "staring me down the whole hearing" and, when the court orally confirmed the children's removal, he mouthed to her, "You're going to pay."

After the hearing, Deputy David Gray with the Polk County Sherriff's Office saw Brown and Quarles yelling as they walked down the stairs inside the Justice Center. He told them to go outside, and they exited the building heading north. A

few minutes later, he received a request to escort Porter to her car. Deputy Gray and Porter exited the building heading south, and they then walked a couple of blocks west to a parking lot where Porter had parked her car. The deputy escorted Porter to the edge of the parking lot and walked east back to the Justice Center. Along the way, he saw Brown walking west toward Porter with Quarles behind him. Deputy Gray testified he told Brown, "Do not follow her," Brown mumbled something he could not hear, and he again said not to follow her. Brown continued walking and stopped next to the exit of the parking lot while Porter was still inside. Deputy Gray returned to the lot and approached Brown. Brown did not move from the exit as Deputy Gray approached, which he found unusual. He testified Brown acted "kind of defensive" and said he parked to the northeast beyond the Justice Center. During the encounter, Deputy Gray noticed Brown had a gun in his waistband, and he arrested Brown for interference with official acts and failure to provide a permit for a concealed weapon.

According to Brown's testimony, he has had a permit to carry weapons for about four years. He typically carries a weapon with him "[a]ll the time" or leaves it in his car or home when going somewhere weapons are prohibited. He acknowledged he was "upset" after the hearing, after which he walked straight from the Justice Center to his car to pick up his gun as he usually does. He then walked with Quarles to her car. He did not realize Deputy Gray was talking to him as they passed each other. He stopped at the exit to the parking lot because another car was exiting, and he did not know Porter was in the parking lot until he was under arrest.

On May 25, the county attorney filed a trial information charging Brown with stalking while in possession of a dangerous weapon and going armed with intent. Trial was held July 31 to August 2. The jury found him guilty of stalking while in possession of a danger weapon and not guilty of going armed with intent. The court sentenced him to a term of incarceration not to exceed five years plus a fine and surcharge. He now appeals, challenging the sufficiency of the evidence supporting his conviction.

"In reviewing challenges to the sufficiency of evidence supporting a guilty verdict, courts consider all of the record evidence viewed 'in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence.'" *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012) (citations omitted). "[W]e will uphold a verdict if substantial record evidence supports it." *Id.* (citation omitted). "Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *Id.*

> A person commits stalking when all of the following occur:
> a. The person purposefully engages in a course of conduct directed at a specific person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened or to fear that the person intends to cause bodily injury to, or the death of, that specific person or a member of the specific person's immediate family.
> b. The person has knowledge or should have knowledge that a reasonable person would feel terrorized, frightened, intimidated, or threatened or fear that the person intends to cause bodily injury to, or the death of, that specific person or a member of the specific person's immediate family by the course of conduct.

Iowa Code § 708.11(2) (2017). Stalking while in possession of a dangerous weapon is a class "D" felony. *Id.* § 708.11(3)(b)(2).

Porter testified about Brown's repeated actions directed at her "that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened or to fear" bodily injury or death. *Id.* § 708.11(2). At I.B.'s school, Brown took pictures of her and her car and confronted her, compelling the officers to intervene. He followed her away from the school to the point she drove to the police station. During execution of the search warrant, Brown again aggressively confronted her, this time causing the officers to physically restrain him. He repeatedly texted and called Porter's personal and office phones, even after being informed she was no longer working I.B.'s case. During the removal hearing, Brown stared at Porter and mouthed, "You're going to pay." After the removal hearing, he walked toward Porter's location with Quarles following him. He ignored Deputy Gray's order to not follow Porter, and he appeared to attempt to confront her by the parking lot while possessing a gun. This testimony from Porter and Deputy Gray provides substantial evidence for the jury to conclude Brown repeatedly directed actions at Porter that would cause—and he knew or should have known they would cause— "a reasonable person to feel terrorized, frightened, intimidated, or threatened or to fear" bodily injury or death. *Id.*

Brown portrays himself as acting "legitimately, throughout the entire case, as any zealous parent fighting to raise their child in the face of DHS opposition would." He disputes some of the testimony from Porter and Deputy Gray, and he claims he had a legitimate purpose for communicating with Porter. Porter acknowledged parents are sometimes upset with her involvement, but she testified she had never seen a parent act like Brown. Her supervisor also testified that Brown's "behavior was escalated in a way that I've not dealt with in my experience.

He was very threatening and intimidating." The jury was entitled to place greater weight on the testimony of Porter, Deputy Gray, and Porter's supervisor. *See State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993) ("The jury is free to believe or disbelieve any testimony as it chooses and to give weight to the evidence as in its judgment such evidence should receive."). Therefore, even considering Brown's testimony, the evidence is sufficient to uphold his conviction of stalking while possessing a dangerous weapon.

**AFFIRMED.**